IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHAEL BACHICHA, an individual
and SUSAN STANOJEVIC, an
individual,

    Plaintiffs,

v.                                                                                                  Civ. No. 10-710 BB/LAM

BOARD OF EDUCATION of the Albuquerque
Public Schools, PAULA MAES, in her individual
and official capacity as a member of the Board;
and WINSTON BROOKS, in his individual and
official capacity as Superintendent of
Albuquerque Public Schools,

    Defendants.

**MEMORANDUM OPINION**

    Before the Court is Defendants' Motion to Dismiss the Plaintiffs' Claims Against Ms. Maes and Mr. Brooks under Title VII and IX and Dismiss Plaintiff's Title IX Claim against all Defendants [Doc. 24].  After briefing, Plaintiffs voluntarily dismissed the Title VII and Title IX claims against Ms. Maes and Mr. Books in their individual and official capacities [Doc. 37 & 38].  The remaining issue for the purposes of this Memorandum Opinion and Order is whether the Title IX claim against the Board of Education of the Albuquerque Public Schools ("Board" or "APS") should be dismissed.

Factual Background

    Plaintiffs Michael Bachicha and Susan Stanojevic were employed by APS as the Principal and Assistant Principal for Curriculum, respectively, at Sandia High School (SHS). Complaint, ¶¶ 4 & 6.  Bachicha began his tenure as principal at SHS in the 2004-05 school

year and Stanojevic began her tenure the next year.  *Id.* at ¶¶ 30 & 31.  They continued in those positions until the end of the 2008-09 school year.  *Id.* at ¶ 32.

In mid-April of 2009, Bachicha received a call from Defendant Maes regarding complaints against Stanojevic for being "unusually inflexible with parents."  *Id.* at ¶ 38.  On April 17, Bachicha met with the Associate Superintendent for Secondary Education, Eduardo Soto.  Bachicha told Soto that Stanojevic was ready to be a principal, but Soto -- indicating Defendant Brooks' office-- said that would be a "tough sell."  *Id.* at ¶ 39.

On May 15 Bachicha received a call from Soto advising him that ten teachers had approached him and said that Bachicha was letting Stanojevic run the school; Soto told Bachicha that he wanted to meet with him.  When Bachicha arrived, he found Brooks in Soto's office.  When Bachicha assured them that Stanojevic was not running the school, Brooks said that Stanojevic had slept her way to the top by "screwing" former APS Superintendent Brad Allison.  *Id.* at ¶¶ 41-43.

Following this meeting, Bachicha advised Soto that he was upset by Brooks' comment and wanted to advise Stanojevic; Soto concurred.  *Id.* at ¶ 45. Bachicha then met with Stanojevic and her husband and told them what Brooks had said.  Stanojevic believed the comment was based on a disgruntled employee's allegations and his threat to "get her." *Id.* at ¶¶ 46-47.

In May, Stanojevic filed a complaint with the APS Office of Equal Opportunity ("OEO") against the disgruntled employee for sexual harassment and retaliation.  She named Brooks and Maes as witnesses.  In its June 4 letter to her, the OEO stated it could not substantiate the allegations.  *Id.* at ¶¶ 48 & 51.   Meanwhile, Soto informed Bachicha

that Stanojevic had filed a charge and Bachicha received a favorable evaluation from Soto. *Id.* at ¶¶ 49-50.

On June 5, Brooks told Bachicha that Stanojevic had made a serious mistake by naming Brooks and Maes in her OEO complaint. Bachicha advised Stanojevic of Brooks' comment. *Id.* at ¶¶ 52-53. Bachicha and Stanojevic then met with Soto and requested a meeting with Maes because they believed she was getting misinformation from the disgruntled employee. Soto told them that Brooks had directed that no employee was to contact a Board member. He then told Stanojevic that she was an excellent candidate for principal and had nothing to worry about in that regard. *Id.* at ¶ 54.

Two weeks later, Bachicha was placed on administrative leave pending the results of an internal audit. He was escorted from the building by two APS police officers, who also accompanied him to his home to retrieve his APS laptop. The next day, June 20, an article appeared in the Albuquerque Journal stating that Bachicha had been placed on leave due to unidentified "misconduct." *Id.* at ¶¶ 55-57. Bachicha did not learn why he was being placed on leave until June 22 or 23, 2009.[1]

On July 2, 2009 Bachicha met with Brooks and Soto and was informed that he was being demoted to principal at LBJ Middle School. *Id.* at ¶ 66. Between June 22 and July 7, three more articles appeared in the Albuquerque Journal alleging the ongoing investigation into Bachicha's misconduct. *Id.* at ¶¶ 65, 69 & 70.

---

[1] The five reasons given were (1) failure to fill out a facilities usage form; (2) a problem with secretaries' overtime compensation; (3) his step-daughter received a scholarship; (4) his step-daughter had been accorded special treatment; and (5) a "breach of confidentiality." Complaint, ¶ 58. The last reason, Bachicha believes, stemmed from his advising Stanojevic of Brooks' comment about her sleeping her way to the top with Superintendent Allison and the filing of a discrimination charge. *Id.* at ¶ 63.

On August 5, 2009 Stanojevic was summarily transferred to a position as Assistant for Building and Grounds at Eldorado High School. *Id.* at ¶ 71. Her salary remains the same. *Id.* On July 16, Bachicha's pay was reduced. *Id.* at ¶ 76.

Discussion

Plaintiff Stanojevic alleges unlawful discrimination on the basis of sex in violation of Title VII, 42 U.S.C. § 2000e-1 (1964). Both Plaintiffs claim retaliation under Title VII. Both Plaintiffs claim retaliation under Title IX. 28 U.S.C. § 1681. Title IX provides in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).

The issues before this Court are whether (1) Title IX's retaliation provisions apply to employees of federally-funded schools; and (2) Title VII preempts Title IX. The circuit and district courts are in conflict on this issue. *See* P. Renee Summers, J.D., Annotation, *Application of Title IX of the Education Amendments of 1972* (20 U.S.C. § 1681 *et seq.*) *to Sex Discrimination in Education and Employment*, 54 A.L.R. Fed. 522 (1981); *Kohlhausen v. SUNY Rockland Comm. College*, 2011 WL 1404934 (S.D.N.Y. 2011) (unpublished opinion) (collecting cases). Neither the United States Supreme Court nor the Court of Appeals for the Tenth Circuit has addressed these two issues.

Plaintiffs rely on *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167 (2005), in which the Court held that "Title IX encompasses claims of retaliation . . . where the funding recipient retaliates against an individual because he has complained about sex

4

discrimination." *Id.* at 171. Plaintiffs read the opinion broadly to encompass retaliation against employees who complain about sex discrimination of other employees.

Defendant Board contends that Title IX does not apply to employees of federally-funded schools; its provisions, the Board argues, apply only to students or, as in *Jackson*, to employees who complain about discriminatory actions against students. The Board further argues that even if Title IX's anti-retaliation provisions would apply to Plaintiffs, Title VII would supercede any relief afforded by Title IX.

Defendant relies primarily on *Lakoski v. James*, 66 F.3d 75 (5th Cir. 1995). That case held that Title IX did not provide a private right of action for employment discrimination and that Title VII provides the exclusive remedy for such cases. *Id.* at 753. Subsequently, in *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242 (5th Cir. 1997), a female basketball coach was denied advancement after she complained about employment discrimination and lack of funding to the women's basketball program. The *Lowrey* court reiterated that Title VII was the exclusive remedy for claims of employment discrimination and retaliation therefor. *Id.* at 248. But the court also held that Title IX retaliation claims would apply to claims of Title IX violations, *i.e.*, the lack of funding to the women's basketball program. *Id.* at 253-54. *See also Wilborn v. Southern Union State Comm. College*, 720 F. Supp.2d 1274, 1303 (M.D. Ala. 2010).

Other courts have concluded otherwise, finding that Title IX applies to employment discrimination and that Title VII is not the exclusive remedy. *See, e.g., Preson v. Commonwealth of Virginia ex rel. New River Comty Coll.*, 31 F.3d 203 (4th Cir. 1994); *Kohlhausen*, *supra*; *Bedard v. Roger Williams Univ.*, 989 F. Supp. 94 (D.R.I. 1997); *Nelson v. University of Maine Sys.*, 923 F. Supp. 275 (D. Me. 1996).

The 1972 congressional hearings for the passage of Title IX indicate that Congress did not intend to foreclose a private right of action for employment discrimination. In *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1992) the Court construed regulations interpreting Title IX's "no person" language to include employees as well as students based on the hearings. *Id.* at 534-537. "In our view, the legislative history thus corroborates our reading of the statutory language and verifies the Court of Appeals' conclusion that employment discrimination comes within the prohibition of Title IX." *Id.* at 530.

Sharply dissenting from the majority's "tortured" reading of Title IX, Justice Powell stated that a "natural" reading of the statute "would limit the statute's scope to discrimination against those who are enrolled in, or who are denied the benefits of, programs or activities receiving federal funding" and would not extend to all employees. *Id.* at 541  He compared Title VII and Title IX and concluded that a comparison of the two statutes "suggests that Congress would not have enacted the inconsistent provisions of the latter with respect to remedies and procedures." *Id.* at 552.

> Title VII is a comprehensive antidiscrimination statute with carefully prescribed procedures for conciliations by the EEOC, federal-court remedies available within certain time limits, and certain specified forms of relief, designed to make whole the victims of illegal discrimination and available unless discriminatory conduct falls within one of several exceptions. *See* 42 U.S.C. § 2000e *et seq.* (1976 ed. and Supp. IV).

*Id.*

Conversely, Title IX "has no time limits for action, no conciliation provisions, and no guidance as to procedure." *Id.*  One argument made by the proponents of Title VII exclusivity is the lack of administrative procedures contained in Title IX. As stated by the *Lowrey* court in declining to revisit *Lakoski*:

6

> We will not compromise the integrity of the comprehensive remedial scheme enacted by Congress to redress claims of employment discrimination, nor will we undermine the specific protections against retaliation that accompany that scheme. *See* 42 U.S.C. § 2000e-3(a).

117 F.3d at 248.

The reasoning of Justice Powell and the Fifth Circuit was the focus in *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009), in which the Court addressed the issue of whether Title IX preempted claims under 42 U.S.C. § 1983.  In determining that a claimant could pursue both avenues of relief, the Court examined three of its prior cases which held Congress' detailed enforcement mechanisms precluded § 1983 relief: *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981) (Federal Water Pollution Control Act; Marine Protection, Research, and Sanctuaries Act of 1972); *Smith v. Robinson*, 468 U.S. 992 (1984) (Education of the Handicapped Act); and *Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) (Telecommunications Act of 1996).

> In all three cases, the statutes at issue required plaintiffs to comply with particular procedures and/or to exhaust administrative remedies prior to filing suit.  Offering plaintiffs a direct route to court via § 1983 would have circumvented these procedures and given plaintiffs access to tangible benefits-- such as damages, attorney's fees, and costs-that were unavailable under the statutes.  Allowing a plaintiff to circumvent the statutes' provisions in this way would have been inconsistent with Congress' carefully tailored scheme.

555 U.S. at 795 (internal quotation marks & citations omitted).

By contrast, Title IX's "only express enforcement mechanism, § 1682, is an administrative procedure resulting in the withdrawal of federal funding . . . ." *Id.*  The Court noted that in two of its prior Title IX decisions, it had recognized an implied private right of action and damages available to Title IX claimants.  *Id.* (citing *Cannon v. University of*

7

*Chicago*, 441 U.S. 677, 717 (1979) and *Franklin v. Swinnett County Public Schools*, 503 U.S. 60, 76 (1992)).  Notably, the *Bell* decision was not mentioned.  The Court thus concluded that Title IX did not preclude relief under § 1983.

Based on the *Fitzgerald* Court's analysis, and consistent with *Lowrey*,  I find that Title VII precludes relief for discrimination and retaliation under Title IX, unless the retaliation derives from a Title IX violation.  *Jackson*, *supra*; *Lowrey*, *supra*.  Accordingly, the Court will dismiss the Title IX claims of both Plaintiffs against Defendant Board of Education.

_____
Bruce D. Black
Chief United States District Judge