# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

MICHAEL BACHICHA and
SUSAN STANOJEVIC,

   Plaintiffs,

vs.            Civ. No. 10-00710 MCA/LAM

BOARD OF EDUCATION of the
Albuquerque Public Schools,

   Defendant.

## MEMORANDUM OPINION AND ORDER

   This case is before the Court upon the Motion for Summary Judgment [Doc. 205]

of Defendant Board of Education of the Albuquerque Public Schools ("APS"). The Court

has considered the written submissions of the parties, the record in this case, and the

applicable law, and is otherwise fully advised.

**Background**

   Viewing the record in the light most favorable to Plaintiffs as non-movants, a

reasonable jury could find the following facts.[1]

---

   [1]This summary does not comprise actual findings by the Court; rather, the summary

During the 2008-09 school year, Plaintiff Michael Bachicha was the principal of Sandia High School ("SHS"). Plaintiff Susan Stanojevic was the assistant principal of curriculum at SHS.

Stanojevic was an intern with APS in 1998 or 1999, during the administration of APS Superintendent Brad Allison. [Doc. 167-2 at 1] Thereafter, she worked in the APS Service Center Department. Bachicha observed her work and found her to be "supremely competent, professional and resourceful." [*Id.*] In 2004, Bachicha became principal at SHS.  In 2005, he hired Stanojevic as assistant principal. [*Id.*] Some parents and staff perceived Stanojevic as dressing provocatively, being too aggressive for her position, being rough around the edges, and being too pretty. [*Id.*at 2] Bachicha considered Stanojevic to be an excellent assistant principal. [Doc. 167-1 at 2]

In April 2009, Bachicha suggested to Assistant Superintendent Eddie Soto that Stanojevic would be a good successor for him at SHS or make a good middle school principal. [Doc. 167-1 at 2; Doc. 167-3 at 5] Nodding toward the office of APS Superintendent Winston Brooks, Soto responded that the idea of Stanojevic as Bachicha's successor would be "a tough sell." [Doc. 167-2 at 2; Doc. 167-3 at 5]

In May 2009, Brooks met with Ron Allen, a student advisor at SHS who was dissatisfied with Bachicha and Stanojevic.  During the meeting, Brooks learned from

---

comprises facts a reasonable jury could find on the record before the Court. *See Coleman v. Donahoe*,  667 F.3d 838, 842 (7th Cir. 2012).

Allen of rumors of an affair between Bachicha and Stanojevic. [Doc. 167-4 at 5]  Allen's gossip-mongering about other employees' sex lives was a violation of APS's sexual harassment guidelines. [Doc. 207-1 at 14]

On May 15, 2009, Soto phoned Bachicha to set up a meeting later that day to discuss complaints from SHS staff that Bachicha was allowing Stanojevic to run SHS. [Doc. 167-1 at 3]  Soto and Bachicha met at APS headquarters later that day. At some point, Brooks joined the meeting. Brooks bluntly asked Bachicha if he and Stanojevic were having an affair. [Doc.167-5 at 2] Brooks told Bachicha that "I don't want to tell you what to do with your personal life, but [Stanojevic] screwed Brad Allison and slept her way to the top." [Doc. 205 at 2, UMF 5] Bachicha denied having an affair with Stanojevic. [Doc. 167-5 at 3] Bachicha, who had heard the rumors about Stanojevic and Allison years before Brooks was hired as superintendent, [Doc. 167-1 at 4] dismissed the remarks about Stanojevic having slept with Allison as stale gossip. [Doc. 167-1 at 5; Doc. 167-3 at 3] Bachicha recalled feeling "like I was in a locker room." [Doc. 167-1 at 12] Bachicha resented Brooks' remarks about Stanojevic, feeling that it perpetuated a sexual stereotype[2] of Stanojevic and indicated that Brooks was blackballing Stanojevic's career. [Doc. 205-1 at 5] Bachicha responded sarcastically, "… this conversation is just among us boys?" [Doc. 167-1 at 12]  Brooks and Soto discussed moving Stanojevic to another school. [Doc. 167-1 at 7] Bachicha responded that that would be "a huge mistake."  [Doc. 167-1 at

---

[2]Brooks testified that even though he is covered by APS's sexual harassment policies, he does not attend training classes on how to avoid sexual harassment. [Doc. 207-1 at 4]

7] Brooks' participation in the meeting ended with Brooks commenting "This sort of behavior can't go on.  We can't allow it in this organization."  [Doc. 167-3 at 3]  Soto was surprised by the intensity of Brooks' remarks. [Doc. 167-3 at 4] Soto understood Brooks to mean that "under [Brooks'] watch nobody would advance in our organization based on what he had heard about [Stanojevic]." [Doc. 167-3 at 2]

Later in the day, Bachicha stopped by Stanojevic's home.  To Stanojevic's husband, Vladi Stanojevic, Bachicha appeared "shell-shocked and visibly distraught." [Doc. 167-9 at 1] When asked by Vladi why he seemed distraught, Bachicha told him that it was because of things Brooks had said about Stanojevic. [Doc. 167-9 at 1] While sitting at a table with Vladi, Bachicha phoned Soto and complained about Brooks' remarks. [Doc. 167-9 at 2] Soto could tell that Bachicha was "bothered" by Brooks' remarks about Stanojevic. [Doc. 167-3 at 4] Bachicha told Soto that Brooks' remarks were sexual harassment, were untrue, and were full of prejudice, and that Brooks was "blackballing" Stanojevic's career. [Doc.167-9 at 2] Bachicha asked Soto for permission to tell Stanojevic about Brooks' remarks.  Soto gave Bachicha permission to tell Stanojevic about Brooks' remarks, saying "Yeah, I'm not quite sure why not." [Doc. 167-3 at 4]  When Bachicha told Stanojevic about Brooks' remarks, Stanojevic "felt like the wind had been knocked out of me. . . . I felt humiliated." [Doc. 207-2 at 3]

On May 19, 2009, Stanojevic filed a complaint with APS's Office of Equal Opportunity Services. [Doc. 189-1]  The OEOS complaint named Allen (the apparent

source of the rumor repeated by Brooks) as respondent and identified Brooks and APS

Board of Education member Paula Maes as potential witnesses.

In June 2009, APS received complaints from a "whistleblower" about operations at

SHS. [Doc. 205-2 at 1] By Tuesday, June 16, 2009, APS's Audit Department had begun an

investigation into the complaints. [Doc. 211-3 at 2].  On the afternoon of Thursday, June

18, 2009, Brooks met with Internal Auditor Peg Koshmider, Chief Operating Officer Brad

Winter, Soto, and possibly, Human Resources Director Andrea Trybus. [Doc. 209-1 at 8

("I believe the meeting actually occurred in the afternoon, so my guess is it occurred the

afternoon prior to this [June 19, 2009] meeting.") ] By the time of this meeting, the

investigation had expanded to five issues. [Doc. 209-1 at 10, 15] Brooks' principal concern

was with allegations of improper timekeeping.  [Doc. 209-1 at 9]

Brooks felt that Bachicha's disclosure to Stanojevic was a breach of confidence.

[Doc. 211-1 at 7]  Brooks was "pretty disturbed" that Bachicha had told Stanojevic about

the May 15, 2009 conversation. [Doc. 209-1 at 9]  By the end of the June 18, 2009

meeting, Brooks had decided to demote Bachicha, [Doc. 209-1 at 12 (Q.  "And was this

the intention that you derived at the meeting that you had with Koshmider, Winter, Soto,

and Trybus?" A. "Yes.")] but had not decided whether to demote Bachicha to an assistant

principal position or to assign him to a teaching position, [Doc. 209-1 at 12 ("Originally, I

was contemplating transferring Mr. Bachicha either to an assistant principal position in the

district or even to a teaching position, which he was qualified for.")] On Friday, June 19,

2009, Bachicha was called to a meeting at Soto's office.  Two APS police officers were standing outside the office when Bachicha arrived. [Doc. 176-2 at 8] Soto gave Bachicha a letter notifying Bachicha that he had been put on administrative leave with pay, pending the results of an internal audit investigation. [Doc. 176-2 at 8; 209-1 at 25]   Soto ordered Bachicha to turn over the keys to SHS.  [Doc. 176-2 at 8] When Bachicha asked, "what is this all about? What did I do? Soto responded "It's just a lot of things from a lot of different places in APS." [Doc. 176-2 at 8]

On Monday, June 22, 2009, Brooks met with SHS staff to explain why Bachicha had been placed on administrative leave.  Brooks referred to five issues.  [Doc. 209-1 at 15]  When a teacher asked if a current assistant principal would be appointed interim principal, Brooks responded that Scott Elder would be the interim principal as he "was better than anything you have here at Sandia right now."  [Doc. 205-4 at 1] On June 22, 2009, Bachicha and Gary Atwood, the executive director of the Albuquerque Public Schools Principals Association, met with Brooks and Soto and other administrators. Sometime prior to July 3, 2009, Brooks held a follow-up meeting with Koshmider, Winter, Soto and Trybus to discuss the interim findings of the investigation. [Doc. 209-1 at 13]  On Friday, July 3, 2009,[3] Bachicha met with Brooks and Soto.  Prior to the July 3, 2009 meeting, Atwood had urged Brooks to be lenient, given that Bachicha was approaching retirement. [Doc. 209-1 at 12]  During the meeting, Brooks stood up,

---

[3]During his deposition, Bachicha recalled that the meeting took place on July 3, 2009, not July 2, 2009 as alleged in the complaint. [Doc. 209-1 at 17]

looming over Bachicha with his fists clenched, and said in a raised voice "I don't trust

you." [Doc. 209-1 at 17]. Bachicha was told that he would be transferred from SHS to

Lyndon Baines Johnson Middle School.

As of July 3, 2009, the draft report had not been prepared.  [Doc. 209-1 at 20]  A

*preliminary* draft report of the investigation was presented to Brooks on July 6, 2009, *after*

Bachicha had been transferred to LBJMS. [Doc. 209-1 at 22]  The final report is dated

August 28, 2009.

Bachicha's replacement, Katy Harvey, was brought in from outside APS by Brooks,

sometime in July 2009, following Bachicha's transfer. [Doc. 205-2 at 2] Harvey's tenure as

SHS principal officially began on August 1, 2009. [Doc. 207-3 at 5] On July 24, 2009,

Harvey visited SHS to look at her office, meeting Stanojevic for the first time.  [Doc. 207-

3 at 4-5]  Stanojevic tried  "to be as professional and as helpful as possible to [Harvey] to

make her transition easy and to communicate to her that I wanted to be part of a leadership

team with her and that I would offer her as much assistance as possible to help get her

acclimated to APS and to Sandia."  [Doc. 207-2 at 4] There was an opening at SHS for an

assistant principal for building and grounds. [Doc. 207-2 at 6] Harvey decided to bring in

Mary de Lopez as an assistant principal. [Doc. 207-3 at 4]  De Lopez was a "curriculum

person and had always worked in curriculum." [Doc. 207-3 at 4] On her first day of work,

after having been principal for only a few hours, Harvey came into Stanojevic's office, sat

down, and told Stanojevic that "[m]y friend Mary is coming to work here and I would be

more comfortable having her in this office rather than you, and I need you to move out into the office across the way[.]"  [Doc. 207-2 at 6] Harvey had decided to summarily evict Stanojevic from her established office because that office shared a bathroom with Harvey's office and Harvey viewed Stanojevic as "subversive" and not someone she could trust. [Doc. 207-3 at 4]  Stanojevic became concerned that de Lopez would be moved into Stanojevic's position as assistant principal for curriculum.[4]  When Stanojevic asked Harvey to clarify de Lopez's responsibilities and inquired if she would remain assistant principal for curriculum, Harvey told Stanojevic that "it wasn't any of my business what [de Lopez] was doing and that I would know when the time came for me to know[.]" [Doc. 207-2 at 6]

Prior to the start of the 2009-10 school year, Brooks had settled on a bell schedule to be followed by all high schools. [Doc. 207-3 at 2]  One or more parents who questioned the new schedule [Doc. 207-1 at 7] asked Stanojevic for data on class attendance. [Doc. 207-3 at 2] On August 3, 2009, Harvey learned from a secretary of these requests. [Doc. 207-3 at 2] Although there was nothing particularly inappropriate about parents having the requested information [Doc. 207-3 at 2], Harvey appears to have been incensed.  Harvey confronted Stanojevic, who assured her that "I wasn't working against APS," "I was just trying to accommodate a parent request." [Doc. 207-3 at 3]  The next day, August 4, 2009, Harvey wrote a scathing letter to Stanojevic, stating that Brooks' decision on the bell

---

[4]The assistant principal for curriculum is perceived as more prestigious than other assistant principal positions.  [Doc. 207-1 at 11]

schedule was "non-negotiable," ordering her "to cease and desist from any further

involvement with this matter," and warning her that "[a]ny further actions on your part to

collect and disseminate this data will be considered an act of insubordination." [Doc. 205-

6]  The letter was cc'd to Brooks and Soto.

Harvey did not have the authority to transfer Stanojevic.  On August 5, 2009,

Harvey phoned Soto, telling him "I don't think I can move this school forward with Susan

as my assistant principal."  [207-3 at 3]   Soto went into Brooks' office, telling him that "as

hard as Ms. Harvey had tried, . . .  it didn't appear that [Harvey] and Susan were going to

be able to make this thing work; and that [Harvey] . . .was requesting that [I] move

Susan."  [Doc. 207-1 at 8]  After confirming that there was an opening for an assistant

principal at Eldorado High School, Brooks approved the transfer.  [Doc. 207-1 at 8]

**DISCUSSION**

By previous orders, all claims by Plaintiffs have been dismissed with the sole

exception of their claims that APS retaliated against them for engaging in conduct

protected by Title VII.

**1.      Law Governing Retaliation**

To state a prima facie case of retaliation under Title VII, a plaintiff must show:

"(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable

employee would have found the challenged action materially adverse, and (3) that a causal

connection existed between the protected activity and the materially adverse action."

*Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013) (quoting *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).  If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate one or more legitimate, nondiscriminatory justifications for the adverse employment action.  *Espinoza v. Dept. of Corrections*, 509 Fed. Appx. 724, 728 (10th Cir. 2013) (summarizing burden-shifting framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Finally, if the defendant-employer meets its burden, the burden shifts back to the plaintiff, who must demonstrate that the employer's justifications are a pretext for retaliation. *Id.*

## 2.      Summary Judgment Standards

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim . . . on which summary judgment is sought."  As our Court of Appeals has succinctly stated:

> Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . .the moving party is entitled to a judgment as a matter of law."  A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented.

*Adamson v. Multi Community Diversified Serv., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).  "The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment."  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998).  "It is not [the court's] province at the summary

judgment stage to weigh the evidence or to make credibility determinations." *Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008). "It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment." *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000). "[A] motion for summary judgment in an employment discrimination case is no different from a motion for summary judgment in any other civil action:  the court acts as a gatekeeper, granting judgment as a matter of law unless the plaintiff has adduced relevant and probative evidence sufficient to support a jury verdict in his or her favor." *Riggs v. Airtran Airways*, 497 F.3d 1108, 1117 (10th Cir. 2007).

3.     **Bachicha**

APS argues that Bachicha cannot make out a prima facie case of retaliation because he cannot show that he engaged in protected activity.  [Doc. 205 at  11]  The Court disagrees.

> Title 42 U.S.C. § 2000e-3(a) prohibits an employer from retaliating against an employee because the employee "opposed any practice made an unlawful employment practice by [Title VII]." Thus, the threshold element of a prima facie case of retaliation requires the employee to show he opposed a perceived violation of Title VII, such as employer discrimination. An employee's "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors."
>
> To demonstrate protected opposition to discrimination, the employee must show "he had a reasonable good-faith belief that the opposed behavior was discriminatory." . . .

*Espinoza*, 509 Fed. Appx.at 728-29 (citations omitted).  APS, citing *Snoke v. Staff Leasing, Inc.*, 43 F. Supp. 2d 1317 (M.D. Fla. 1998), argues that Brooks was merely

repeating a gender-neutral rumor, not engaging in gender-based discrimination.  The Court is not persuaded by this argument.  As the Court has previously observed, "it is exceedingly rare for a man to be accused of sleeping his way to the top; accusations that a person has traded sexual favors in exchange for a promotion, or a part in a movie, for example, are almost entirely directed at women." [Doc. 170 at 7] "Unfortunately, traditional negative stereotypes regarding the relationship between the advancement of women in the workplace and their sexual behavior stubbornly persist in our society.  Because we are cognizant that these stereotypes may cause superiors and coworkers to treat women in the workplace differently from men, we find that a reasonable jury could conclude that [plaintiff] suffered the effects she alleges *because she was a woman*." *Spain v. Gallegos*, 26 F.3d 439, 447 (3d Cir. 1994) (emphasis added).  "[S]ince these are accusations based on the fact that [the target] is a woman, they could constitute a form of sexual harassment." *McDonnell v. Cisneros*, 84 F.3d 256, 259-60 (7th Cir. 1996);  *see also Jew v. Univ. of Iowa*, 749 F. Supp. 946, 958 (S.D. Iowa 1990) (concluding that allegations of an affair between associate professor and her superior were not gender neutral;  noting there was no suggestion that the male party to affair was accused of *using* a sexual relationship to gain favor with an administrative superior) ("Were [plaintiff] not a woman, it would not likely have been rumored that [plaintiff] gained favor with the Department Head by a sexual relationship with him.").  Moreover, Brooks' remarks were not mere gossip by co-workers. A reasonable jury could view Brooks' remarks as sexual

stereotyping of an APS employee by APS's ultimate decision maker on personnel matters.

[Doc. 167-3 at 2] A reasonable jury could view Brooks' remarks as a sexist attack on

Stanojevic's professional qualifications--*i.e.* she would not have advanced to the position

of assistant high school principal but for the fact that she was a physically desirable

woman willing to trade sexual favors for advancement.  A reasonable jury could view

Brooks' remarks as expressing Brooks' intention to foreclose Stanojevic from further

opportunities for advancement within APS--*i.e.*, that she may have slept her way to an

assistant principal job under prior administrations, but she would not got a  promotion

while Brooks was superintendent.  Title VII makes it an unlawful practice to "classify . . .

employees . . . in any way which would deprive or *tend to deprive* any individual of

employment opportunities. . . because of such individual's . . . sex. . . ." 42 U.S.C.

§ 20003-2(a)  (Emphasis added).  Thus, given the "tend to deprive" language in

§ 20003-2(a), classifying Stanojevic for purposes of advancement on the basis of a sexual

stereotype would have been unlawful if the classification *tended to deprive* her of future

opportunities for advancement, even if such unlawful classification had not yet resulted in

an adverse employment action. Whether Brooks' "slept her way to the top remark"

amounted to boorishness, unlawful sexist stereotyping, or both, is a matter for a jury to

resolve. A reasonable jury that views Brooks' remarks as sexist stereotyping could find

that Bachicha had a reasonable, good-faith belief that Brooks had engaged in conduct

proscribed by Title VII by classifying Stanojevic for purposes of advancement on the

basis of her sex.

APS argues that even if Bachicha has made out a prima facie claim of retaliation, that prima facie case is rebutted by APS's articulation of a legitimate, non-discriminatory reason. According to APS, "[i]t is undisputed that APS believed that Bachicha acted inappropriately in many respects at Sandia HS." [Doc. 205 at 15] APS refers to two undisputed facts in support of this statement:  UMF Nos. "10, 14" [Doc. 205 at 15] UMF No. 10 refers to a whistleblower complaint [Doc.  205 at 3];  UMF No. 14 refers to the conclusions  in the Management Investigation Report [Doc. 205 at 4].

To decide if these grounds amount to one or more legitimate, non-discriminatory reasons, the Court asks whether "the stated reason for its actions [], if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)(emphasis omitted)). At this second step in the *McDonnell-Douglas* analysis,"to rebut the presumption [created by the prima facie case] '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons.'" *Hicks*, 509 U.S. at 511 (quoting *Burdine*,  450 U.S. at 254).  "[The court] need not decide that the [defendant's] proffered reason . . . is credible or sufficient.  The employer's burden is simply to demonstrate a legitimate, nondiscriminatory reason for its actions." *Cone v. Longmont United Hosp. Assoc.*, 14 F.3d 526, 530 (10th Cir. 1994) (citation omitted).  Applying this standard, the Court

concludes that a reasonable jury could find that APS's concern about the whistleblower complaint provided a legitimate, non-discriminatory rationale for demoting Bachicha. However, the Court concludes that the second reason articulated by APS fails the *Hicks* test. The demotion occurred on July 3, 2009. Not even the *preliminary* draft report had been completed at that point. [Doc. 209-1 at 20] No reasonable jury could find that Brooks relied on a Management Investigation Report that did not even exist when he made the decision to demote.

The third, and final, step in the *McDonnell Douglas* framework requires the Court to consider whether the evidence of record would permit a reasonable factfinder to reject APS's proffered rationales as pretext and find that Bachicha's demotion was the result of unlawful retaliation. Evidence of pretext may take any form, as long as it permits a reasonable jury to infer that the proffered reason was not the employer's actual reason for the adverse employment action. *See Swackhammer v. Sprint/United Mgt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) ("Evidence of pretext may also take a variety of other forms. '[A plaintiff] may not be forced to pursue any particular means of demonstrating that a [defendant's] stated reasons are pretextual.'"). "Judgments about intent are best left for trial and are within the province of the jury." *Randle v.City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995).

The undisputed evidence establishes that Brooks was the final decision maker with respect to personnel matters. [Doc. 167-3 at 2] There is evidence that prior to Bachicha's

disclosure of Brooks' sexist remarks, Brooks had held Bachicha in high regard. [Doc. 167-5 at 4]   There is evidence from which a reasonable jury could find that Brooks had made the decision to demote Bachicha as early as June 19, 2009, as the internal audit investigation just was getting underway and before Bachicha even had been formally notified of the charges.   At that point in time, Bachicha's disclosure of Brooks' sexist remarks to Stanojevic--which Brooks viewed as a serious breach of confidence--was the only reason for demoting Bachicha that actually had been confirmed.[5]   The investigation into the whistleblower complaint had just begun and the Management Investigation Report had not yet been completed.   Brooks conceded that the perceived breach of confidence was one of the reasons he placed Bachicha on administrative leave.  [Doc.189-2 at 2] In view of evidence suggesting that Brooks was deeply and personally aggrieved by Bachicha's disclosure of Brooks' sexist remarks, a reasonable jury could find that the actual decision to demote Bachicha occurred by June 19, 2009 (although it was not implemented until July 3, 2009) and was based on Bachicha's perceived breach of confidence[6] in informing Stanojevic that she was the victim of sexual stereotyping, not the reasons subsequently set out the report of the investigation.   The period between Bachicha's protected activity on May 15, 2009 and the June 19, 2009 decision to demote

---

[5]As the Second Circuit Court of Appeals has noted in a related context, "the protesting of illegal discrimination is protected by law and cannot be a basis for a loyalty test." *DeCaire v. Mukasey*, 530 F.3d 1, 21 (1st Cir. 2008).  Similarly, the Court concludes that Brooks had no reasonable expectation of confidentiality with respect to sexist remarks about Stanojevic to the extent that those remarks were evidence of illegal discrimination on the basis of sex.

[6]Brooks did not learn that Soto had given Bachicha permission to speak to Stanojevic until after he transferred Bachicha to LBJ Middle School. [Doc. 167-5 at 4]

him is sufficiently brief as to support an inference of causation. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 804 (10th Cir. 2007) (holding one-month period between plaintiff's last protected activity and adverse employment action sufficiently brief to support inference of causation). A reasonable jury could find that given APS's own procedures, unconfirmed allegations of misconduct--the only reason given by APS that existed as of July 3, 2009-- were not an adequate reason for demoting Bachicha.[7]

The Court will deny summary judgment as to Bachicha's retaliation claim.

## 4.   Stanojevic

As noted above, the first element of a prima facie case of retaliation requires a showing that the plaintiff engaged in protected conduct. There is no dispute that Stanojevic filed an internal complaint with APS's OEOS. [Doc. 189-1] APS argues that Stanojevic's filing of an OEOS complaint does not constitute protected activity under § 20003-3(a)'s *participation* clause. [Doc. 205 at 16-17] Be that as it may, the filing of an internal complaint protesting unlawful discrimination is protected activity under § 2000e-3(a)'s *opposition* clause. *PVNF*, 487 F.3d at 804. "Protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004); *see also Kotcher v. Rosa and*

---

[7]Pursuant to APS policies, Bachicha, as the subject of a draft report, was entitled to the opportunity to respond in writing to the draft report, "specifying agreement with each of the findings and recommendations and/or reasons for disagreement with findings and recommendations." APS Internal Audit Policies, available at http://www.aps.edu/about-us/policies-and-procedural-directives/procedural-directives/old-procedural-directives/internal-audit

*Sullivan Appliance Ctr.*, 957 F.2d 59 (2d Cir. 1992) (holding that making internal complaint of sexual harassment is protected activity).

Furthermore, there is evidence that Stanojevic completed an EEOC intake questionnaire on July 23, 2009, and that by August 3, 2009, APS was aware that Stanojevic had contacted the EEOC.  The limited authority that the Court has found holds that the submission of an intake questionnaire is protected activity.  *Soublet v. La. Tax. Comm.*, 766 F. Supp. 723, 734 (E.D. La. 2011); *Richardson v. Horry County*, C.A.No. 4:05-2086-TLW-TER, 2008 WL 906559 (D. S.C. Mar. 31, 2008).  The dissent in *Federal Express Corporation v. Holowecki*, includes a detailed review of the role of intake questionnaires in the EEOC charge process.  552 U.S. 389, 408-20 (Thomas, J., dissenting) (2008). Although an intake questionnaire by itself ordinarily does not constitute a formal charge, it clearly initiates the EEOC process leading to the filing of a formal charge:  "The EEOC accepts charges via a thorough intake process in which completed intake questionnaires are not typically viewed as charges, but are used to assist the EEOC in developing the charge." *Id.* at 417.  Given the role of an intake questionnaire in the initiation of an EEOC proceeding, it is inconceivable that the filing of an intake questionnaire would not be protected participation for purposes of 42 U.S.C. § 2000e-3(a).

The Court concludes that Stanojevic has made out a genuine issue of material fact as to the first element of a *prima facie* case of retaliation under the participation and opposition clauses of § 2000e-3(a).

For purposes of its motion for summary judgment, APS does not dispute that Stanojevic experienced an adverse employment action:  the transfer from assistant principal of curriculum at SHS to assistant principal of buildings and grounds at Eldorado HS. [Doc. 210 at 5]  Given this concession, the Court assumes for purposes of analysis that Stanojevic has established the second element of a *prima facie* case of retaliation.

APS argues that Stanojevic cannot establish causation,[8] the third and final element of her *prima facie* case.  As APS correctly observes, unless the adverse employment action closely follows the protected activity, a plaintiff must have evidence in addition to temporal proximity to support a causal connection. [Doc. 205 at 18 (citing Tenth Circuit authority)].  APS points out that more than eleven weeks elapsed between Stanojevic's May 19, 2009 OEOS complaint and her August 5, 2009 transfer.  However, APS overlooks crucial items of evidence.  The passage of time does not bar a retaliation claim where there is additional evidence of retaliatory motive.  *Piercy v. Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007).  First, and most importantly, there is Brooks' ominous June 5, 2009 statement to Bachicha that Stanojevic had made a serious error of judgment by naming him in her OEOS complaint.[9]  APS does not dispute that Brooks made this

---

[8]*University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013), makes clear that the requisite causal connection is that of "traditional principles of but-for causation."

[9]In its opening brief APS notes that Stanojevic named Allen as the respondent, suggesting that because Brooks was merely named as a witness he had no stake in the OEOS investigation. However, a jury could reason that Brooks' primary concern with the OEOS complaint was that in the course of the investigation into the OEOS complaint he inevitably would have to own up to having made inappropriate and crude sexist comments about a female employee.

statement to Bachicha.  [Doc. 210 at 3]  A reasonable jury could interpret Brooks' remark
to mean Stanojevic should have thought through the career consequences of putting
Brooks in a position where he would have to admit making inappropriate sexist remarks.
Viewed in this light, Brooks's statement is persuasive evidence of retaliatory animus.
Moreover, the Court has determined earlier in this opinion that Bachicha has made out a
submissible claim that Brooks retaliated against Bachicha for divulging the facts upon
which Stanojevic's OEOS complaint was based.  A jury could infer that Brooks' animus
was directed at Stanojevic and Bachicha jointly, as both were implicated in the filing of
the OEOS complaint, and that Brooks' "serious error of judgment" remark coupled with
the acts of retaliation against Bachicha in June and early July 2009 reflected still
simmering animus for the filing of the OEOS complaint.  *See Marx v. Schnuck Markets,
Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) (relaxing "closely followed" requirement where
pattern of retaliation begins soon after the protected activity and only later culminates in
adverse employment action). Lastly, Stanojevic's last protected activity prior to the
transfer was the filing of her EEOC intake questionnaire.[10]  Stanojevic filed her intake
questionnaire with the EEOC less than two weeks prior to her August 5, 2009 transfer.
This period between the protected activity and the adverse employment activity is

_____

[10]APS argues in its reply that Stanojevic has not come forward with evidence that Soto or
Brooks was aware of the intake questionnaire. [Doc. 210 at 6] This argument comes too late.  In
its opening brief, APS skipped over Stanojevic's initial contact with the EEOC. [Doc. 205 at 21]
In so doing,  APS failed to satisfy its initial burden as summary judgment movement. The Court
will not permit APS to assert for the first time in a reply brief the absence of evidence as to a
material fact. *Glad v.  Thomas County Nat'l Bank*,  No. 87-1299-C, 1990 WL 171068 *2 (D. Kan.
Oct. 10, 1990).

sufficiently brief to support an inference of causation under settled Tenth Circuit precedent.  *PVNF,* 487 F.3d at 804. The Court concludes that Stanojevic has established genuine issues of material fact with respect to causation, the third and final element of her *prima facie* case.

APS argues that it has articulated two legitimate non-discriminatory reasons for transferring Stanojevic: (1) Stanojevic's inability to work with newly appointed SHS principal Katy Harvey and (2) the results of the internal investigation set out in the August 28, 2009 Management Investigation Report.  The Court concludes under the standards set out above in the Court's discussion of Bachicha's claim, that APS has satisfied its burden of articulating legitimate non-discriminatory reasons for transferring Stanojevic.

The final step in the Court's analysis is a determination of whether a jury could find that the reasons advanced by APS were pretexts.  With respect to the Management Investigation Report, the Court once again notes that the final report was not completed until August 28, 2009, well after Stanojevic had been transferred. When Brooks was asked about the decision to transfer Stanojevic, he stated that the decision was made in response to Harvey's request, and that he could not recall any other reasons.  [Doc. 167-4 at 3]   A reasonable jury could find that the Management Investigation Report played no part in the decision to transfer Stanojevic.

Turning to the other reason articulated by APS, the Court recognizes, as APS points out, that Stanojevic's transfer was immediately preceded by Harvey's complaints to

Soto.  The evidence viewed in the light most favorable to Stanojevic would allow a

reasonable jury to find that Harvey announced that she was moving Stanojevic before

Harvey had had any substantial interaction with Stanojevic that would have justified

unfavorable conclusions about Stanojevic.  In the absence of a satisfactory explanation by

Harvey of why from her first interactions with Stanojevic she deemed Stanojevic

subversive and untrustworthy, a jury could question the legitimacy of Harvey's concerns

and infer that someone had poisoned Harvey's attitude toward Stanojevic before she and

Stanojevic began working together.  There is evidence, apart from the summary eviction

of Stanojevic from her office, that Harvey was gratuitously rude to Stanojevic, telling

Stanojevic that it was none of her business when Stanojevic quite reasonably inquired if

she would retain her position as curriculum assistant principal. A jury also could find that

Harvey overreacted to Stanojevic's attempt to provide parents information about

attendance.

　　　"A showing of pretext requires a plaintiff to 'produce evidence of such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally find

them unworthy of credence and hence infer that the employer did not act for the asserted

non-discriminatory reasons.'" *Allen v. Sulzer Chemtech, USA, Inc.*, 289 Fed. Appx. 278,

284 (10th Cir. 2008) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d

1193, 1203 (10th Cir. 2006)).  Here, pretext resolves to the question of Brooks' subjective

state of mind--the actual reason he decided to transfer Stanojevic.  Stated in terms of but-for causation, the question is whether Brooks would have seized on the opportunity to transfer Stanojevic provided by Harvey's complaints if Stanojevic had not made the "serious error of judgment" of naming Brooks as a witness in her OEOS complaint.

On the record before the Court, a reasonable jury that believes Stanojevic and disbelieves Harvey could find that Harvey set out to establish a poor working relationship with Stanojevic.  However, for Harvey's complaints to amount to pretext, there must be evidence that would permit a reasonable jury to conclude that it is more likely than not that Brooks, not caring whether Harvey's complaints about Stanojevic were legitimate, used her request as a convenient cover for retaliation.  "[S]ince [a court] must assess pretext by examining the facts as they appear to the person making the decision . . . the question is not the factual accuracy of the [evidence of employee misconduct] but whether [the employer] reasonably 'perceived' that it was accurate."  *Tesh v. United States Postal Serv.*, 349 F.3d 1270, 1273 (10th Cir. 2003).

The record does not contain much, if any, evidence as to how Brooks typically would have responded to complaints about a subordinate.  The Court will assume that a reasonable jury could find that Harvey's complaints could have justified Brooks' decision to transfer Stanojevic.  But it is far from clear that the type of complaints made by Harvey *necessarily* would have led to the transfer of  an assistant principal in the normal course of APS employment decisions.  The question is not whether Brooks could  have transferred

Stanojevic based on Harvey's complaints, but rather, what "actually did cause the adverse employment action."  *Milliron v. 704 HTL Operating, LLC*, No. CIV 09-0694 BRB/ACT, slip op. [Doc. 74] at 20 (D.N.M. Aug. 20, 2010) (internal quotation marks omitted; quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 492 (10th Cir. 2006)).

  As the Court understands summary judgment, if the evidence on a material issue as to which the plaintiff bears the burden of persuasion is such that a hypothetical reasonable jury could not find in the plaintiff's favor, summary judgment will be granted to the defendant. If the evidence on the issue is such that a reasonable jury could not find in the defendant's favor, summary judgment will be granted in the plaintiff's favor. Finally, if the evidence on the issue is such that a reasonable jury could find in favor of either party, summary judgment will be denied.  In this last case, there is said to be a "genuine issue of material fact."  A summary judgment procedure that takes the plaintiff's case from the jury where the evidence is such that a reasonable jury *could find* in favor of the plaintiff, but *not necessarily would find* in the plaintiff's favor, would usurp the jury's function: "If summary judgment were to be granted erroneously in the face of a genuine dispute over material facts, the jury's province as established under common law would be invaded." 11 *Moore's Federal Practice* § 56.06 (3d ed. 2013). "[C]ases involving . . . civil rights 'frequently are unsuitable for summary judgment' because 'a necessary element of the claim for relief presents an inquiry into the state of mind of one or more of the parties.'" *Seamons*, 206 F.3d at 1028 n.2. It is undisputed that Brooks had the final say on personnel

matters and that Soto consulted Brooks before transferring Stanojevic.   Given evidence of Brooks' expressed hostility toward Stanojevic as a woman he viewed as having slept her way to her position as assistant principal, his veiled threat (the "serious error of judgment" remark), and his recent demotion of Stanojevic's mentor, a jury could reason that Harvey's request provided Brooks with the perfect cover for payback and that the actual reason for the transfer was to punish Stanojevic for filing the OEOS complaint.   "[D]isbelief of the defendant's articulated reasons for its actions, together with a prima facie case, can establish unlawful discrimination." *Randle*, 69 F.3d at 452.   The Court will deny summary judgment as to Stanojevic's claim that the transfer was in retaliation for protected activity.

APS also has moved for summary judgment on Stanojevic's claim that she was denied promotion to principal positions as retaliation for protected activity.

On August 26, 2009, Stanojevic applied for the principal positions at Chelwood Elementary School and Alameda Elementary School.   [Doc. 205 at 6, UMF No. 28; Doc. 207 at 6, Plaintiff's response to UMF No.28] APS concedes that Stanojevic can make out a *prima facie* case of retaliation with respect to the August 26, 2009 applications. APS argues that it relied on two legitimate non-discriminatory reasons in not hiring Stanojevic as principal at these elementary schools: (1) the criticism of Stanojevic's performance at SHS reported in the August 28, 2009 Management Investigation Report and (2) her inability to work with Katy Harvey as reported by Harvey.

As discussed above, Stanojevic has established genuine issues of material fact on

the question of whether APS's reliance on Harvey's complaints was pretextual.  The Court's analysis is equally applicable to the August 26, 2009 applications.  Turning to the criticisms of Stanojevic's performance at SHS contained in the August 28, 2009 Management Investigation Report , the Court concludes that (1) the criticisms satisfy APS's burden of articulating a legitimate non-discriminatory reason for not hiring Stanojevic as an elementary school principal and (2) that Stanojevic has not come forward with evidence that would permit a reasonable jury to find that APS's reliance on the Management Investigation Report was pretextual.  Since Stanojevic has not established that the second reason asserted by APS was pretextual, the Court will grant summary judgment as to her claim that she was not hired as the principal at Chelwood ES and Alameda ES as retaliation for having engaged in protected activity.  *Luster v. Vilsack*, 667 F.3d 1089, 1093-94 (10th Cir. 2011) (upholding grant of summary judgment where plaintiff failed to show that both reasons given by employer were pretextual).

Stanojevic unsuccessfully applied for the principal position at Jefferson Middle School in May 2011 and for the principal position at Eisenhower Middle School in June 2012. [Doc. 205 at 6, UMF Nos. 28, 32; Doc. 207 at 6, Plaintiff's response to UMF Nos. 28, 32] APS argues that the gap between the denial of these applications and Stanojevic's last protected activity--the filing of her EEOC charge in August 2009-- prevents her from making out a genuine issue of fact as to causation. [Doc. 205 at 21] The Court agrees with APS  that the gap between these applications and Stanojevic's most recent protected

activity deprives Stanojevic of  permissive inferences of a causal connection with respect to the middle school principal positions. The Court further concludes that Stanojevic has not come forward with additional evidence that would permit a reasonable jury to find a causal connection between Stanojevic's protected activity and the selection of other candidates instead of Stanojevic. The Court will grant summary judgment as to Stanojevic's claim that she was not hired as principal of Jefferson MS and Eisenhower MS as retaliation for having engaged in protected activity.

Lastly, APS argues that Stanojevic has failed to mitigate damages attributable to her loss of status in being moved from an assistant principal of curriculum position to an assistant principal of buildings and ground position. [Doc. 205 at 24]  Stanojevic responds that (1) the assistant principal position at DNHS was not a realistic possibility as the principal of DNHS was not receptive to hiring Stanojevic (2) the assistant principal openings at Albuquerque High School and La Cueva High School were not restricted to assistant principal for curriculum positions and (3) she was not qualified for the assistant principal position at LCHS.  [Doc. 207 at 6-7, Plaintiff's response to UMF Nos. 29-30]

"An employee discharged in violation of Title VII has an obligation to mitigate her damages by using 'reasonable diligence in finding other suitable employment.'"  *Hawkins v. 1115 Legal Serv. Care.*, 163 F.3d 684, 695 (2d Cir. 1998) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982)).  The employer-defendant bears the burden of proof as to failure to mitigate. *Id.* Where the movant bears the burden of persuasion (as, for

example, a defendant moving for summary judgment on an affirmative defense)

> the movant may not meet its initial burden by pointing to the nonmovant's
> lack of evidence on a contested issue. . . .When the movant bears the burden
> of persuasion at trial, the movant must produce evidence that would
> conclusively support its right to a judgment after trial should the nonmovant
> fail to rebut the evidence. In other words, the evidence in the movant's favor
> must be so powerful that no reasonable jury would be free to disbelieve it.
> Anything less should result in denial of summary judgment.

11 *Moore's Federal Practice* §56.40[1][c] (3d ed. 2011).

The Court concludes that APS has failed to come forward with evidence of failure to mitigate damages that is "so powerful that no reasonable jury would be free to disbelieve it."  APS has not met its burden of showing entitlement to summary judgment on the issue of mitigation of damages. The Court will deny APS's motion for summary judgment on the issue of mitigation of damages.

**5.       Damages for Emotional and Physical Injury**

APS argues that Plaintiffs lack expert testimony to support their claims for emotional and physical injuries and that in the absence of such testimony their claims for damages for emotional and physical injuries fail. [Doc. 205 at 26]

Expert testimony is not required to recover of damages for emotional distress.  *See Bolden v. S.E. Penn. Transp. Auth.*, 21 F.3d 29, 34 (3d Cir. 1994) (holding that plaintiff in § 1983 action is not required to present expert testimony in support of damages for emotional distress) (collecting authorities); *Jacobs v. Meister*,108 N.M. 488 (Ct. App. 1989) (same). Plaintiffs may prove that they experienced emotional distress due to APS's

retaliation through their own testimony and that of persons who had the opportunity to observe their demeanor.

APS argues that Plaintiffs may not call as experts the physicians and counselors who treated them because they did not timely disclose these experts. The Court notes that the federal cases cited by APS predate the 2010 amendments to Fed. Civ. P. Rule 26. Current Rule 26(a)(2)(B) applies only to experts "retained or specially employed to provide expert testimony. . . ."[11] Disclosure of experts such as treating physicians is governed by Rule 26(a)(2)(C), which does not require the expert to provide the detailed written report required of retained experts. Treating physicians and other non-retained experts may "testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705." Advisory Committee note to 2010 amendment to Rule 26, subdivision (a)(2)(C). Plaintiffs' failure to provide Rule 26(a)(2)(B) expert reports does not require exclusion of the expert testimony of treating professionals.

The Court will deny APS's motion as to Plaintiffs' claims for emotional and physical damages.

**CONCLUSION**

For the reasons set forth above, the Court will grant APS's motion for summary judgment as to Plaintiff Susan Stanojevic's claim that she was denied principalships at

---

[11]Magistrate Judge Martinez made this point in her October 19, 2011 Order Adopting Joint Status Report and Provisional Discovery Plan with Changes and Setting Case Management Deadlines. [Doc. 108 at 2 n.1]

Chelwood Elementary School, Alameda Elementary School, Jefferson Middle School and

Eisenhower Middle School in retaliation for activity protected by Title VII and will deny

APS's motion in all other respects.

**WHEREFORE,**

**IT IS THEREFORE HEREBY ORDERED** that Defendant APS's  Motion for

Summary Judgment [Doc. 205] is **granted** as to Plaintiff Susan Stanojevic's claim that she

was denied principalships at Chelwood Elementary School, Alameda Elementary School,

Jefferson Middle School and Eisenhower Middle School in retaliation for activity

protected by Title VII, and is **denied** in all other respects.

**So ordered this 10th day of March, 2014.**



_____

M. CHRISTINA ARMIJO
Chief United States District Judge